Afternoon, Illinois Appellate Court, 1st District Court is now in session, the 1st Division. The Honorable Michael Hyman presiding, case number 1-8-2512, Stephen M. Kalk versus Donna L. Kalk. Before we begin, Mr. Schaefer, is everybody on the line going to be arguing? I think we have people that aren't going to be arguing on the line. They can listen and watch, but they shouldn't be on the video. I will check out everyone except for the attorneys, Justice. You're all set now, Justice. I don't... All right. We still see their names. These are the people who are arguing. Well, who's arguing?  Two, Your Honor. Justice. I'm arguing for the attorneys. I'm arguing for Stephen Kalk. And I'll be arguing on behalf of Donna Kalk. Okay. So, Mr. Schaefer, are you able to get rid of the boxes for everybody else? I did get rid of the boxes. You can see them on your gallery? Yeah. We have a Mary Ellen Wells that doesn't look like it's muted. There you go. So, we have Nicole Honorato and Karen Levin. You are the two who are going to argue? Yes. Okay. Okay. All right. And Ms. Levin, you represent Stephen Kalk. Okay. And Nicole... Nicole Honorato from B.D. Freeman Honorato Family Law Group on behalf of the appellee cross appellant Donna Kalk. Also present is Maria Citino from Citino Family Law, also representing Donna Kalk. I'll be the one arguing today. Thank you. Thank you. As far as the time, and because of the cross appeal, what we would appreciate is if the you can discuss also the dissipation argument. Okay. 30 minutes. 30 minutes? Very good. And then for the rebuttal, we'll give you an extra 10 to, or if you need a little more, to rebut and for the cross. And then if you have a few more minutes you want on the reply on the cross appeal, that'll be fine. You get the last word on that, just on that issue. Otherwise, we're going to proceed as if we were in the courtroom. We will speak up when we have a question. I would appreciate if you finish your statement so we don't talk all at once. And then we'll ask you our question or comment and proceed in that manner. Anybody have any questions? Very good. Okay. Thank you. You may proceed. Good afternoon. Stephen Kalk speaks to correct the trial court's legal errors related to three assets that it classified as marital property in which the court should review saying no vote. The first is Stephen's ownership interest in a bank holding company, National Bank Corp Holdings, which I'm going to refer to as NBHI, which Stephen acquired with a non-marital shareholder distribution from Chicago Bank Corp, which was a company he founded before the marriage. The next is the Truckee property, which is real property Stephen purchased in Truckee, California, before the marriage. And the third issue are two Charles Schwab accounts that Stephen traced to investment accounts that he owned before the marriage. Next, Stephen also speaks to correct the trial court's abuse of discretion when it valued his interest in NBHI at a time closer to trial rather than closer to the start of the divorce proceeding because the value of his interest grew 500% from $16 million up to $80 million, so by $64 million during the pendency of his divorce. I'm going to start with NBHI. It was created in June 2010 for the sole purpose of acquiring Generations Bank. In April of 2011, the federal regulators approved the sale, and Generations Bank was then purchased. Let me ask you, isn't there a presumption that his interest in NBHI is marital property? Well, anything created during marriages would be marital property, that's correct. But NBHI, when he created it in July of 2010, was just a mere shell. It wasn't, there was nothing in it, and it was set up to reflect his interest in Chicago Bank for it, which was 70%, and his brother John's interest was 30%. Are you talking about formal receptions? No, I'm not, and let me explain why. Let's take a look at a hypothetical. Let's suppose that a party knew they were getting an inheritance, and so they decided to set up a bank account for the sole purpose of having the inherited funds go into this bank account. Now, the inheritance had to go through probate court, and so while things were going through probate court, the party sets up an account in a bank. There's nothing in the account. It's idle, and it remains idle until the inherited funds go into that bank account. I don't think that there would be anybody who would debate that if there was some sort that Section 503A1 would apply in this scenario, because it would be inherited funds, which would be non-marital, and both the inherited funds and the account would be non-marital. It would make no sense to talk about an account with nothing in it. The same is true here. NBHI was only set up because in order to get regulatory approval, the cult needed a holding company. It had nothing in it until the time when Generations Bank was purchased, and it went into NBHI. Also, at that time, $2 million was also put into NBHI, and that came also from the transaction, and that capitalized NBHI. The fact that NBHI needed the full $2 million, which the regulators said they had to have, indicates that there was absolutely no money in NBHI at the time that it was set up. Well, I don't think you said it absolutely. First of all, you agree that Stephen has the burden to show by clear and convincing evidence that his interest was non-marital, correct? He has the burden to show that his interest is non-marital because it was purchased by Generations Bank. By clear and convincing evidence, and the judge found that he did not meet that burden. Go ahead. So, why should we overrule the judge? Where's the abuse? Well, the abuse is in how the judge interpreted Section 503c1 of the Act. So, what the judge did was misapplied the fact, and so maybe a little history of what happened would be helpful. So, Stephen put $2.5 million from a Northern Trust account into the bank and made a capital contribution in order to ensure that his loan covenants would not be affected once the shareholder distribution went through in order to purchase the bank. And so, that's the way that transaction occurred. And because the transaction occurred through a shareholder distribution from a company that the trial court found was non-marital, it was non-marital under Section 503a8 of the Act. And so, Stephen did prove that by clear and convincing evidence. What the trial court did was apply a transmutation analysis to this $2.5 million that went into the capital contribution, which is completely inappropriate because Chicago Bank Corp. was not Stephen's asset. It was a third-party, state-licensed, regulated bank. And as a result, the notion of trying to talk about co-mingling of marital or non-marital property or having issues of conduits makes no sense when you're dealing with a third party. So, the trial court was in error in how it applied 503c1 of the Act. So, that was a legal error. There's no dispute here about the flow of funds. Nobody disagrees that on April 4th and 5th, $3 million went out of the bank and it paid off some legal fees in connection with the transaction. It bought Generations Bank out of bankruptcy and it refunded or recapitalized NBHI with $2 million. And so... Can I ask a question, please? Sure. Your contention is, is that the $2.5 or $3 million that was used to purchase Generations Bank... No? You're shaking your head. Shareholder distribution... Yes. Your contention is that the money used to buy the Generations Bank came from shareholder distribution from Citibank, Citibank. Chicago Bank Corp. Chicago Bank Corp. Correct? That's your contention? Yes. But Chicago Bank Corp. could not have made the shareholder distribution but for the $3 That's not correct. So that's another undisputed piece of evidence that went in. There was expert testimony that went unrebutted that at the time that April 4th and 5th, when the bank was purchasing the shareholder distribution, Chicago Bank Corp. had over $4 million. $4 million, $14,000 change of cash and cash equivalent. So it could easily have funded the $3 million deal. But the government required the $3 million infusion of capital because, according to what I read, the bank, Chicago... What's the name of the bank? Chicago Bank? Well, Chicago Bank Corp. was... All right. Chicago Bank Corp. would potentially have been in violation of its loan covenants if it made that $3 million purchase at that time. Therefore, they needed $3 million infusion of capital to allow for the purchase of Generations without being in violation of the bank's loan covenants. Correct. That's not accurate. Okay. So first of all... First of all, there's two questions here. Question number one is whether or not Chicago Bank Corp. had enough funds without the cost of $2.5 million to do the bank transaction. The answer to that question is yes. There was $4 million, $14,000 available in liquid assets, cash and cash equivalent. Why didn't they do it? Well, they did. Now, that's what they did. I mean, they used money from Chicago Bank Corp. to buy the transaction. There was also another question that we're talking about in terms of loan covenants. And yes, there was a possibility that the loan covenants could have been violated. No one says that they were going to be violated. Both experts testified to that. Mr. Godbout, in his report, said there could be a risk of a violation. And both Steve and Mr. Potter said, that was our expert, said that it was possible it could have happened. But they wanted to make sure that it didn't. But that's a separate question. I mean, it could have happened that they put out the $3 million to do the deal and then thought, okay, well, maybe now we ought to put some more additional money to make sure that we didn't violate the loan covenants. But that's just not what happened. And this was three years before the breakdown of the marriage and before these proceedings started. So there wasn't anything nefarious or any kind of planning involved in this. This is just the way they structured the transactions because the Kauffbrothers wanted to have a Chicago Bank Corp. shareholder distribution, purchase the bank, because that was the next best thing, instead of having Chicago Bank Corp. buy the bank, which it couldn't do under the federal regulations. Okay, so that was ‑‑ But all of this, whatever you're ‑‑ all of this that you just said, it still comes down, in my opinion, to the court weighing conflicting evidence. It's not for us to weigh that evidence. First thing, everything was undisputed. It wasn't undisputed. There were a lot of disputes, and there wasn't an agreement between the experts necessarily with regard to the sources of the money. I don't think your expert even did a tracing of the money, where the other side's expert did and found it was part marital and part nonmarital. So the judge had to make a decision and didn't have to ‑‑ I don't see this as anything more than a factual dispute. I disagree with you, respectfully. I don't think anybody disagrees that Chicago Bank Corp money went out, and it went out directly to purchase the bank and to pay off some closing costs and to recapitalize NBHI. That's undisputed. It's also undisputed that the money that went out were shareholder distributions. That was set up both in Stephen's 2011 K‑1, which was unrebutted, the audited financial statements for the bank for 2011, which were also not rebutted, and the general ledger from 2011, which clearly shows shareholder distributions going out to purchase the bank. So I don't think they're disputed. It's just a question of how you label them. Can I ask you about ‑‑ does your argument involve this $1 million cashier check? I'm sorry. Did you hear that? Are you talking about the Schwab account? I'm talking about the $1 million cashier's check that your expert testified that he believed that it came from Chicago Bank. Okay. That's in connection with the Schwab account. All right. So there were three transactions that happened in connection with the Schwab account. One was a million dollar cashier's check. Another one was a purchase of David Crawford's shares in MPHI, and the third one was another check that the trial court found to be marital property. So $1 million, we said, had to have been non‑marital, because where else would it have come from? At that time, the only money that was anyplace was in Chicago Bank work. Okay. So your expert was unable or did not do a tracing that was satisfactory to the court with respect to that asset, correct? The million dollars, he did not trace. He did not trace Northern Trust Bank. He didn't do a direct tracing. You're making a distinction between that and the assets we were just talking about as far as the testimony, whether or not it's unrebutted. I'm sorry. This is unrelated to MPHI. I just want to make clear that the million dollar check had to do with whether or not ‑‑ No, I didn't hear that. Okay. So you want to know whether the expert did a tracing. Correct. He did not do what is a complete tracing. He did a tracing that was more in the line of what the court did in In Re, the Marriage of Foster, which was to take a look at marital expenses and the money in the account. And in Foster and in our case here, what the trial court found was that the marital expenses ate up all of Mr. Kalt's salary. And so what was left was shareholder ‑‑ had to be shareholder distributions from Chicago Bank Corp. Because that was the only place that he was getting any money of any substance that was not salaried. And both experts found, as did the trial court, that Mr. Kalt was paid in excess of what normal people or mean were paid for people running a bank at that price. So as a result, the shareholder distributions that the court found in connection with a sale of a 5% interest in Chicago Bank Corp. were non‑marital assets. So I'm not sure if I answered your question, but that's the kind of tracing our expert did. We also took a look at the expenses from 2008 and 2010, and you can see that the spending way outnumbered the salary that was going into these accounts. So the next mistake that the trial court made with respect to NBHI was applying a transmutation analysis under 503C1 of the Act. That section has nothing to do with rules where third parties are involved. You're running out of time. Do you want to go on to your ‑‑ unless we have any other questions on this issue, I suggest you go on to your other issue. All right. Well, I wanted to say something about the valuation of NBHI. I think it was an abuse of discretion to value it at the time of the divorce. And that's because the court made a legal error and determined that there was a stipulation that did not exist in the record to use that date. And as a result, that was an abuse of discretion on the trial court's part, and it makes sense and was beyond ‑‑ it was beyond reason to come out with a value where during the penalty sweep, the asset grew 500% to $80 million from $16 million. There's also the issue of trustee property. And in there ‑‑ Ms. Levine, let me interrupt you there. The court gave Mrs. Koch 30% interest in basically Generations Bank, right? NBHI. The stock in the holding company. Correct. What difference does it make what the value is of the holding company if she's getting 30% as of year one or year three? Okay. So she got 30% which is $24 million. That's one and a half times the amount that NBHI was worth when the divorce case was filed. The court found that it was worth $16 million. So $16 million and $24 million is a big difference. I get the difference there, but if it's 30% ownership of the holding company, correct? Yes. It's 30% whether it's in 2013 or whether it's 2016, correct? The value then is just 30% of something. All right. So the act now has a provision that allows the trial court to use its discretion to determine the valuation date. And what we're saying is the valuation date should have been at the time of filing. I understand that. But what difference does it make here where the court awarded 30% of X to Mrs. Kalk? What difference does it make if it's worth $1 today and $10 tomorrow? It's 30% of something, correct? I really don't understand because if the trial court had used the date of filing, we would be talking about, let's say, 30% of $16 million which would be $5.something million that she would have gotten. Instead, she got $24 million. So it's a huge difference because you would have stopped the valuation of that asset at the time the divorce was filed so she wouldn't have participated in the growth. So the court did not award her – let's say there were 1,000 shares. The court did not award Mrs. Kalk 300 shares. She awarded her the equivalent of 30% of whatever value those 300 shares were worth. She got shares, but the shares were – the court determined the shares were worth $24 million. So that's what she received, $24 million, as opposed to some fortune of $16 million. And we think it's the only reason that that should have happened. And following up on Justice Pierce's question, I don't know if you're answering this question because if she's getting 30% of the stock, whether you use – it's 30% of the stock, not value. She got 30% of the stock. She got part stock, part cash. Okay. That's what this question was, that she'd get 30% of the stock. And you're saying now it was part stock and part cash? Correct. Okay. How much was stock and how much was cash? She got $8 million in cash and the rest was taken stock. And it was paid out over time. So she did not have to have voting shares or anything like that to pay out over time. All right. So with the Truckee property, the trial court provided and made Stephen trace where he paid the mortgage off of, and that certainly extends under 50386.5, which provides that property that acquired with loans secured by non-marital property remains non-marital even if the mortgage is paid off with marital funds. So the judge gave the credit for that. Gave credit for the mortgage and the payment that he made for the property, didn't she? It paid reimbursement, as a matter of fact. Okay. So that's not an issue. But that's not sufficient. No. That's a big difference. The asset was 4,2.175. And that was because of what happened during the time of the marriage is when they built together, they built – she was involved in it, wasn't she? That's a disputed fact. I'm not sure it's relevant. The judge makes that decision. So isn't this a question of abuse of discretion? No, it's not abuse of discretion. The judge treated the land and the house on the land as two separate things when what happens in the general rule set forth in the case law, DDA, and various others is that if the land is non-marital, then the structure adheres to the land, and it, too, is non-marital. It was a mistake to take a look at these two, the land and the house, as different entities. And that happened because she followed a case, which was an exception to the rule, where the wife built a house on land that her father owned and then bought the father's land. And in that case, they went away from the general rule, which is that structures on land are part of the land. So here, it was undisputed, he bought the land before the marriage, so mortgage payments would not – he did not have to pay under the newly 6.5 of the Act, and so, therefore, it should have remained non-marital. It wouldn't have mattered whether she worked on the house or she didn't. So that's that. And finally, there are the Schwab accounts. And in the Schwab – with respect to the Schwab accounts, I think we're saying that the court should follow Perlmutter as opposed to Machovius and Davis. And that following Perlmutter makes a lot more sense. It's an easier test to apply, which means that if an account is non-marital, then the money that goes into that account, if it happens during the marriage, it transmutes to non-marital property. And that's what the test was in Perlmutter, and so the trial court erred as a matter of law in not following that line of cases and then following lines of cases, which require courts to go through and essentially be accountants and having to go through looking at all of the transactions that occurred to determine whether or not it was marital or non-marital, and that creates accounts for like one year. So those were the mistakes. Any other questions? Okay, thank you. Please proceed. Thank you. May it please the court, it is our position that the trial court correctly found that Stephen's interest in National Bank Corp Holdings, Inc. and BHI, the home in Truckee, California, the Schwab account, were all marital property, and that the classification of these assets as marital property was not against the manifest weight of the evidence. Further, it is our position that the trial court's decision to value Stephen's interest in NBHI as of December 31, 2016, was not an abuse of discretion. Counsel just told us with regard to the bank, it was all undisputed. Is that correct? The funds used to capitalize and to acquire Generations Bank, the source of those funds is a disputed fact. This whole series of transactions is disputed. Whether or not there was a shareholder distribution incident to the Generations Bank transactions, that's absolutely disputed, and we argue that there is zero evidence that there was a shareholder distribution from Chicago Bank Corp incident to the Generations Bank transaction. Furthermore, this is not a de novo review, because the trial court, who heard 17 days of testimony from 10 different witnesses, including the parties and their experts, is in the best position to determine the credibility of all the witnesses and determine the facts and evidence. The court made several findings relative to Stephen's credibility, which was that he was not credible, that his testimony lacked credibility on several issues, including the issue of the $1 million shareholder distribution that Justice Coghlan asked about. So what we would ask is that this court give the trial court due deference to that 71-page judgment for dissolution of marriage that set forth very detailed findings and rulings, because the court's in the best position to hear the testimony of the witness and to hear the evidence. Regarding her cross appeal, Donna asks that you reverse the trial court's decision that approximately $2,657,000 worth of her dissipation claims were time barred. I will respond to Stephen's arguments in his appeal first. The trial court's finding that Stephen's interest in MBHI was marital property was not against her manifest weight of the evidence. As justices discussed earlier, MBHI was incorporated by Stephen and his brother, John Coghlan, in 2010. This occurred during the marriage. Since MBHI was incorporated during the marriage, the marital presumption applies. In order to rebut the statutory presumption that Stephen's interest in MBHI is marital property, he had to show by clear and convincing evidence that his interest in MBHI was acquired in one of the manners set forth in Section 503A1-8 of the Act. He failed to do so. As found by the trial court, there was no evidence presented that at the time of incorporation in June of 2010, MBHI was acquired in a manner set forth in Section 503A, and there was no evidence presented of any shareholder distribution to acquire that interest in MBHI in June of 2010. Stephen did not address any of the 503A factors as related to the acquisition of his interest in MBHI in June of 2010, and he did not rebut that statutory presumption. The failure to address the Section 503A factors in relation to the acquisition of that interest in MBHI is important because Stephen owns an interest in MBHI. He does not own an interest in the Federal Savings Bank, which was previously Generations Bank. His interest is in MBHI. That was the asset that was valued by the party's expert, and that was the asset that was ultimately allocated by the trial court. So instead of telling you, this is how I acquired my interest in MBHI in June of 2010, and here's how I did it in one of the methods set forth in Section 503A of the Act, instead Stephen tries to shift your focus to April of 2011 when MBHI acquired Generations Bank. That transaction occurred almost one year after MBHI was incorporated, and he attempts to rewrite and recharacterize the reality of the facts and events surrounding that Generations Bank transaction to fit into one of those limited exceptions in Section 503A1-8. As you heard today, he argued he had a shareholder distribution of $2.5 million from Chicago Bank Corp. that was used to purchase Generations Bank, and then he argued at trial that the $2.5 million became an asset of Chicago Bank Corp. when he transferred the funds from his Northern Trust account to Chicago Bank Corp.'s operating account. Both of these arguments fail when we examine the actual facts, the history of how that Generations Bank transaction occurred. The purchase of Generations Bank was a highly regulated transaction. Stephen and John, as the sole shareholders of MBHI, had to apply for and receive approval from the Office of Thrift Supervision in order for MBHI to acquire Generations Bank. Part of the regulatory approval process included submitting to the Office of Thrift Supervision a detailed application which documented, among other things, the source of the funds that was going to be used to purchase and capitalize Generations Bank. The paperwork that was submitted to the Office of Thrift Supervision and the testimony from Stephen's corporate counsel showed that the source of funds to purchase and capitalize Generations Bank would be personal funds from Stephen and John, funds in existence held on accounts owned by Stephen and John. Stephen submitted proof, including his own bank statements, statements from his Northern Trust account 7803 and statements from his Charles Schwab account 6612, to show, here's where I have the $2.5 million of my own personal funds that I'm going to use to contribute for the purchase and capitalization of Generations Bank. And this is important. The Cox had to use personal funds to fund the Generations Bank transaction because, as again, Stephen and his corporate counsel testified, they were not permitted by federal regulation to use funds or assets from Chicago Bank Corp to fund this transaction. Chicago Bank Corp was a state-regulated mortgage bank, and in contrast, Generations Bank was a federally regulated bank. They were absolutely prohibited from using anything from Chicago Bank Corp to fund the acquisition of Generations Bank. Stephen's own trial testimony confirmed that, consistent with the regulatory requirements, in the end of March 2011, he personally transferred $2.5 million from his Northern Trust account to Chicago Bank Corp's operating account. And then those funds were aggregated with the $500,000 that John contributed and then went out to the various, four days later, to the various direct payees to fund the purchase and the acquisition of, the capitalization and acquisition of Generations Bank. $2 million went to NBHI for capitalizing the bank, and then about $930,000 went to Armed Services to buy the bank, and then there were various other direct pays. What about the date we were talking about for the stock, whether it should be 2016 or 2013? Oh, the valuation date. Yes. Yes, the valuation date. Section 503F of the Act provides that the trial court has discretion to use a date as close as possible to the trial or as agreed upon by the parties for purposes of valuation. In this case, there was an agreement to value Stephen's interest in NBHI as of December 31, 2016. But what if we don't find that there's an agreement? If you don't find there was an agreement, then the trial court still has discretion to use the date that's as close as possible to trial. December 31, 2016 is closer to trial than December 31, 2013. I didn't understand that the sole basis of the judge's ruling was her finding that there was an agreement? She did find that there was. Was that the sole basis? I believe that was the sole basis, but it's also within her discretion. We did not value the bank as of December 31, 2013. Donna's expert did a rebuttal saying this is why Stephen's valuation as of December 31, 2013 had some issues. But the agreement, and if you look at their motion limine number one to exclude evidence and references to Paul Manafort, right in their own pleading, they say there's an agreement to use December 31, 2016 as the current valuation date. That was the agreement. And that's exactly what happened. Both experts valued the interest as of December 31, 2016. And with respect to the value of the stock, in keeping with Justice Pierce's question, I'm still confused why that would matter with respect to the stock. So with the stock, the court ultimately determined that the value of Stephen's interest in MBHI was $80 million. And awarded Donna 30% of that, essentially 30% of MBHI. What the court did then was say I'm going to give you part in cash and part in stock. So what matters for the part in cash? The stock part of it, the court said, okay, so I'm going to give you $24 million worth of stock, which is whatever X percentage of stock that he currently owns. So it was almost kind of a hybrid. I would acknowledge that the court was looking at the value itself, but did award Donna shares and cash as well as shares to get her to that full 30%. Very good. Have I answered your question? Yes. Okay. So the trial court found that the $2.5 million of Stephen's personal funds that went in, going back to the acquisition of Generations Bank, that $2.5 million of Stephen's funds that he personally contributed from his Northern Trust account, the trial court looked at this and said this is not Chicago Bank Corp funds and this is not a shareholder distribution. And found that Stephen didn't trace the source of those funds. The court found that it was undisputed that the $2.5 million originated from Stephen's Northern Trust account 7803. And as you heard today, acknowledgement that Stephen didn't trace it, Stephen's expert didn't trace the source of the funds. Stephen's expert acknowledged I didn't do a direct tracing analysis. I looked at the party's expenses for the period of 2008 to 2010. That time period predated the March 2011 transaction in question. And that's not a sufficient tracing analysis. If we look at the case law, the case law says that testimony alone is not sufficient for clear and convincing evidence, especially if there's evidence available to trace the source of funds. Tracing requires that the source of funds be identified. This is in re the marriage of Gidear and in re the marriage of Sturr. In this case, Donna's expert did trace the source of funds in Northern Trust account 7803 to several different marital sources, including but not limited to the party's paychecks, joint investment funds, and a $500,000 deposit from Stephen's marital Charles Schwab account 6612 that went in immediately prior to the Generations Bank transaction. Regarding the shareholder distribution argument that Stephen makes, there was no shareholder distribution to Stephen incident to the Generations Bank transaction. Illinois law defines when looking at shareholder distributions, Illinois law tells us retained earnings and profits of a subchapter S corporation are a corporate asset and remain the corporation's property until severed from the other corporate assets and distributed as dividends. In this case, it is clear, consistent with the regulatory paperwork, consistent with Stephen's representation, the funds, the $2.5 million went in from his personal account to Chicago Bank Corp's operating account and then was aggregated with John's funds and went out to direct payees. There is no distribution from Chicago Bank Corp to Stephen Koch or to John Koch. If you look at the 2011 K-1, there's not a $2.5 million distribution reflected on Stephen's 2011 K-1. The funds were netted out against the five different transactions that were surrounding Generations Bank. The $3 million went in and then it went out and it zeroed out and that's what their own accountant testified. This wasn't a distribution. It would make completely logical sense to say, I'm going to make a distribution, I'm going to put funds in from my own personal account and then you send it right back out to me. No funds went to Stephen. The funds went out to the direct payees. Excuse me, can I ask a question, Annette? The bank holding company purchased Generations Bank, correct? Yes. And is it accurate that 100% ownership of the bank holding company lies with Stephen and his brother? At that time, yes, 70% and 30%, yes. Stephen had the majority interest. Chicago Bank Corp? Chicago Bank Corp did not own any interest in the bank holding company. No, and it couldn't. I understand. Correct, yes. It's a fact, okay. Yes, Justice. In fact, all of the regulatory paperwork referenced Stephen and John as the sole shareholders of NBHI who would be acquiring Generations Bank. So there was not even cash, there wasn't cash available in Chicago Bank Corp in March 2011 to make that distribution and that's where we got the issue with the loan covenants and whether or not we're going to trip the loan covenants. Cash and cash equivalents is not the same thing as cash. This was a liquidity issue. So that $3 million had to be there because otherwise they would violate their own loan covenants. Regarding the transmutation argument, Stephen made the argument at trial that the $2.5 million was transmuted to Chicago Bank Corp property. That's R3883-N4 of the transcript. So this was his own argument. And first of all... You may want to go into the other arguments so you have time to... Okay, very good. All right. I will spend... We hit the valuation, so I'll spend a couple minutes on Truckee. The Truckee residence was constructed during the marriage. As such, it's presumptively marital property under Section 503B. Also, if we look at... The argument made, as I understand it, is because the property was premarital property, they're saying that anything built on that property belongs to Stephen. Right. That's their argument. That's their argument that it's making. But if we look at the case of Samar... I'm going to slaughter the name, but I believe it's Samarja, S-A-M-A-R-D-Z-I-J-I-A. The appellate court there, this was a third district case, but the appellate court determined that the home constructed by the parties during the marriage was presumptively marital property, even though the home was titled in the husband's name and was built on his premarital lot. Here, yes, the home was built on Stephen's premarital lot, but it was built during the marriage. Stephen never showed a nonmarital source of funds for the construction of the home. In fact, the court found that his testimony that he paid cash to have the home constructed was not credible. And also, there was an issue of credibility here where he was talking about Donna's involvement in the construction of the home. So I think that this case is more analogous to Samarja rather than, I believe it was Hankey, was the case that was cited by opposing counsel. Hankey, the court was looking at grain bins in a Morton building that was built on farmland held in trust by the husband's parents. Not only that, in this case, the court took judicial notice of statements in the pleadings... Absolutely. ...that Stephen presented, it was marital property. Absolutely. Which they, I guess, don't accept. And while maybe not dispositive, it's certainly absolutely relevant that Stephen asked the entire time during the pre-decree proceedings to have marital funds used to pay for the expenses for this home and claimed in his own pleadings that the Truckee residence was one of the largest assets of the marital estate. So I think that the trial court, it was not against the manifest weight of the evidence to determine that the home was marital property. Am I correct that the court found Truckee to be marital property? Correct. And then reimbursed Stephen his purchase price and mortgage payments. Reimbursed Stephen, yes, for the lot. There was evidence that he paid about $54,000 towards the lot before the marriage. And then while we dispute whether or not he traced the funds that paid off the lot, some $200,000 during the marriage, the trial court ultimately gave him reimbursement for that full amount, some $271,000. And you raised no issue on that? We're not appealing that. Okay, thank you. Yes. Regarding the Schwab accounts, again, the Schwab accounts, both accounts were opened during the marriage, so therefore the marital presumption applies. Stephen failed to trace the cash in the individual securities held in the Schwab accounts to nonmarital sources. This is what the trial court found. Justice Coughlin brought up the $1 million check to Schwab account 6612. Stephen claimed that that was a shareholder distribution. The trial court found, this is on the Supplement C-38, that that testimony was not credible. So he did not trace the individual securities in the Schwab accounts. These were investment accounts. The securities were traded. These were, you know, new securities being created all the time. He didn't trace what happened during the marriage, and therefore the court gave him credit for what he could show he had prior to the marriage. But ultimately, these new accounts were presumptively marital because they were opened during the marriage. On the amount. So as I understand it, the court reimbursed Stephen $493,000, correct? Correct. I believe it was $400,000. Okay. So as I understand it, and from the court's order or judgment, the basis for that is a May 1999 account balance. Correct. And there is also information about account balance in Blair. Right. From 2001. My question is, how did the court come up with the $493,000? I mean, where was the court getting those numbers? I believe the court looked at the final statements of the accounts immediately prior to the time of marriage. And I know that there was some issue on appeal that Stephen raised in his brief that there might have been an error of, you know, some tens of thousands of dollars or whatever that we didn't address. You know, that the court, there was a statement, I believe, that was closer in time to the marriage that the court looked at an earlier statement, and that's where they got one of the numbers that was used to come up with this premarital, total premarital balance. So what is your response to that? We did not respond to that in our brief because there was an issue with, I believe there was, it was corrected, there was one statement that would have been closer to the time of the marriage. It wasn't as significant. We're waiving that. You're waiving it. So we should just correct it ourselves and use the 2001 balance. Correct. Okay. Okay, regarding dissipation, Donna's cross appeal involves a question of statutory construction, and so therefore this is reviewed on a de novo basis. In this case, we're looking at subsections one and four of section 503D2 of the Act. Section 503D2.1 addresses when a party claiming dissipation must give notice of that claim to the other party. And that section provides that a notice of intent to claim dissipation shall be given no later than 60 days before trial or 30 days after discovery closes, whichever is later. Here, discovery closed on August 8, 2017. Donna tendered her notice of intent to claim dissipation on September 7, 2017. So don't we have to look at subsection one and subsection four? Correct. When you look at subsection four, it says that someone is not entitled to dissipation occurring before three years after the party claiming dissipation knew or should have known. Nope. We have a three-year window there. That's it. And so three years, if when she knew or when she filed it, she could only go back three years. Isn't that correct? No. Respectfully disagree. The filing, the timing, the issue of when she had to give notice, that's covered by section one. That's the 60-day, 30-day, 60 days before trial or 30 days before discovery closes. That's when you give notice of what I'm claiming is dissipation. Section four addresses, says no dissipation shall be deemed to have occurred prior to three years after the party claiming dissipation knew or should have known as a dissipation. That tells the trial court, this is the time period where you, the trial court, can say dissipation occurred. So when did the party know or should have known that dissipation could occur? During that three-year period, you can find that these items are dissipation. But it has nothing to do with... What is the three-year period here? Well, the three-year period here is not from the period of September 3rd, 2014, which is what the trial court found. The three-year period here is when did that dissipation actually occur? And it's our argument that the dissipation actually occurred when Stephen transferred funds from the new Northern Trust account that he held with his brother. So if you recall, Stephen had about $3.76 million in Northern Trust account 7803. And then right before he filed for divorce, he took those funds out. And six months later, he redeposited $3.7 million of those funds into two new Northern Trust accounts, which he threw his brother's name on those two new accounts. So the trial court said that when Stephen said on September 3rd, 2014, Stephen's counsel sent a letter saying that before being redeposited to these new Northern Trust accounts, the $3.7 million had been in John's possession. But they were redeposited into those new Northern Trust accounts. It is our contention that the dissipation didn't occur in – Donna didn't know or should have known of dissipation on September 3rd, 2014, because no dissipation had occurred at that time. The $3.7 million was still on account in those two new accounts, for which Stephen had access and control. And in fact, the evidence shows that John – I don't know what the attorneys were talking about at the time. Pardon? Your client's attorneys were asking about the dissipation at that time. Donna's attorneys were asking for an accounting. Right. Where were the funds? So something might be going on with that account. Sure, something might be going on with the account. So they knew or should have known. So I'm just still trying to answer my question. So in this case, no dissipation shall be deemed to have occurred prior to two years after the party claiming dissipation knew or should have known. When does that – tell me the date that that begins. We look three years from what date? From when Donna knew or should have known? Number four. What is the date for number four? Is there a date? It's when she would have gotten the records and documents during discovery that would have shown that the funds got transferred out of the new Northern Trust accounts to John or out of Stephen's possession and control. That's when she knew or – that was during the discovery process. The specific transactions which Donna complained about that were dissipation in which the court said were time barred all occurred in 2016 and 2017. There was a total withdrawal of $771,058 from Northern Trust Account 3752 that occurred between April 2016 and March 2017. Over $679,000 of that was given to John. There was a $500,000 cashier's check from Northern Trust Account 0590, which was one of the new accounts, that was given to John in April of 2016. The proceeds from the Christopher Hinson loan, over $1 million in proceeds, were paid from Stephen to John in January of 2017. Just so I understand, what your contention is that in 2014, there was no dissipation. Correct. In 2015, there was no dissipation. I'm sorry. In 2015, there was no dissipation. It wasn't until 2016 that there was dissipation. Is that correct? Right. That's what Donna set forth in her dissipation claim. Here are the specific transactions that I'm saying are dissipation, and here are the specific dates in which this occurred. In layman's terms, then why did the judge dismiss the claim? Respectfully, the judge erroneously read that three-year time period that's in Section D-4, read that as a notice requirement, and it's not a notice requirement. The notice, you give notice according to Section 1, and your notice has to be filed 60 days before trial or 30 days after the close of discovery. Donna did that. So, no matter what, her notice… So, she filed a dissipation claim in September of 17. Correct, within 30 days of discovery. Claiming that dissipation had occurred in September of 16. In 2016 and 2017, there were several transactions. Right. And those events of dissipation were within three years of when she learned about it. Yes. Okay. So, your contention is the 60-day period or the 30-day period only had to deal with when it had to be filed. Correct. Once filed within the time period, you could go back three years. Right. And you could say, when did it occur? Okay. When did the actual dissipation occur? When was that three years or, you know, no more than three years prior to when you knew or should have known? But all of these transactions occurred in what most of the ones that we're looking at for purposes of this argument were 2016, 2017. In other words, if she had learned about dissipation in 2017 and the dissipation she claims occurred in 2010, she could not file the claim because it was more than three years from the date she learned of the dissipation. Well, when you knew or should have known of the dissipation. No more than ten, no, no more than three years prior to when you knew or should have known of the dissipation. So, I suppose. Well, the legislature is saying we're not going to go back 30 years. Correct. And relitigate or litigate a dissipation claim. We'll allow you to go back three years from the time you learned about. But you got to file it within 60 or 30 days. Or perhaps the legislature was looking at a course of conduct that could have been determined to be dissipation. For example, gambling. If you know that your spouse is a gambler and you found that out in 20, you knew for sure in 2015, you can't go back to 2010 or 2012 or whatever and claim all that gambling losses were dissipation. When did you know or should have known that it was a course of conduct? These are specific transactions. So, I think that the temporal component of that is very relevant. Well, how did the court then consider 2014 as a date when you're claiming no dissipation in 2014? How could she say you should have known in 2014 when you're saying the dissipation didn't even start in 2016? Right. The court said that at that time, on September 3rd, 2014, that Donna knew or should have known that the funds could have been dissipated because they were held in it that John could have dissipated the funds. The fact that they could have been withdrawn by John because they were in accounts held with Stephen and John's name on them. In September of 2014, Stephen took $3.7 million of marital funds and put them into a joint account with Stephen and his brother. Correct. So, the brother could theoretically have taken the money, all $3.7 million out at that point in time because it was a joint account that came from marital funds. Could have, but did not. And she knew about it. Correct. That Donna knew that, yes, these are sitting in an account with Stephen and John's name on it. But the fact that John could have taken it, you know, doesn't mean that it was dissipation because dissipation is routinely defined by the court as one spouse's use of marital funds and marital property for his or her own benefit for a purpose unrelated to the marriage when the marriage was undergoing an irretrievable breakdown. Where's the use of the funds for an improper purpose? And that's not until Stephen moves the funds out of those two new Northern Trust accounts. And, in fact, the trial court itself, the trial court found all of the expended funds in Donna's dissipation claim were marital. And most of the claim dissipation arose from Stephen making transfers to his brother John, which is not a marital purpose. That's on page 50, C50 of the supplemental record. So, but for putting this arbitrary timing requirement saying that Donna had three years from September 4th, 20, or September 3rd, 2014, to give notice of the dissipation claim, all of these transactions would have been found to be dissipation because they were marital funds and not for a marital purpose. They went to John, not a marital purpose. So it was, by eviscerating that section one of 503D2, by taking out that notice requirement, that's what, that's the major error here. And it was compounded by the court erroneously saying, well, John could have accessed those funds, so that's dissipation. It's not dissipation if the funds aren't wasted. And we know this because that account 3752, which was one of the two new accounts, that was still left at the end of the case, and that was allocated by the trial court. The funds that were left in that account were allocated by the trial court. So if Stephen had just left the $3.7 million sitting in that account, it would have still been there at the end for the court to allocate and to give to Donna, or Donna and Steve. Okay. Any other questions? Nope. Okay. Ms. Levine? I just want to clarify one thing that Justice Pierce asked before, and I'm sorry that I didn't understand the question. But this has to do with what the trial court awarded in connection with NBHI. So she valued it at the time of trial, and she valued it at $80 million. She awarded Donna $24 million, not 30% of the stock, $24 million. She allowed Stephen to pay for it in two separate ways. One portion of it was paid in cash, and I said $8 million. It's actually $9 million. And the other part was paid for $15 million worth of stock at that time. So I think you were saying that if she got 30%, then the growth would have been up anyway, and it would have made the difference. But that's not what happened here. She didn't get 30%. What she got was $24 million. So I just wanted the record to clarify that. I also want the judges to be aware that nobody acted as though there was a stipulation. No one. Because our expert came in, issued a report. It went into evidence. It was no objection. So the value at the end of 2013 went in, and then it was rebutted, and the rebuttal report went into evidence too. There was no objection. Those two dates were both at play. So no one acted as though there was a stipulation. So the trial court, in essence, abrogated its ability to use its discretion because it made a finding that made no sense, and that's the Scaleman case. All the Scaleman cases. Next, I just want to, before I go into the statute of limitations, just say that fee credibility was not an issue with the flow of funds for how the bank was purchased. There were other issues that the trial court found credibility issues on, but the court has to take a look at each transaction itself, and there were no credibility issues with NBHI. And there was also no dispute about the flow of funds. Nothing was rebutted regarding the 2011 general ledger that came into evidence, the 2011 K-1 of Stevens that went into evidence, and the 2011 audited financial statement also went into evidence. Also, there was no finding that there was not enough money to, that was not rebutted, that there was $4 million of cash and cash equivalents, so that there could have been a purchase of the bank with just what Chicago Bank Board had in its coffers. And also, there was no representation that the Kauffbrothers had to use a certain bank account to purchase the bank, and they didn't. They just had to show they weren't going to get any debt, and they used the Chicago Bank Board shareholder distribution. Ms. Levine, do you agree that the Chicago Bank Board has no interest in the bank holding company? Correct. 100% of the bank holding company is held by the Kauffbrothers. At the time of the transaction, it was. Now, there are other shareholders. But it wasn't the bank's money that went to purchase. I didn't ask that. I'm just saying that the Chicago Bank has no interest in the holding company. That's correct. The holding company owns Generations Bank. Correct. Okay, thank you. Okay, now I want to talk a little bit about the statutory interpretation argument that's been going on with respect to the dissipation. So, there are two requirements. One is in Section 4, which sets forth a statute of limitations and a statute of repose. And the statute of limitations is three years from when you were should have known of the dissipation. The other requirement is that you can't file notice of a claim of dissipation later than 60 days before trial and 30 days after the close of discovery, whichever is later. These two serve different purposes. The little one provision about the 60 days before trial and the 30 days after the close of discovery is just a notice claim so that there isn't any sort of unfair or surprising trial until the opposing party is aware of the claim. The other one has to do with all sorts of concerns the statute of limitations has to deal with. Students' memories fade, witnesses disappear, documents are lost, and so… My question is, if the dissipation that is claimed did not occur until 2016, then how can the statute go back to 2014? Okay, so the dissipation occurred in 2014. That's what the judge found.  Dissipation occurred when Steve and John became joint parents on that account which happened in July of 2014. Why is that dissipation? If money is still in the bank, nobody's using it. I mean, all it is is a transfer from one bank account to another bank account with a signatory being the brother. Right? No. Because at that point, Steve, and at one point earlier, he gave all of the money to John. That was dissipation. That was the non-marital… He gave the $3 million to John? Yes. Yes, he did. He took $700,000 and then… When was that? What was the date of that? January 24th, 2014. What do you mean by he took? I mean, again, it's a question of whether he used it or not. He closed down the account, and on January 24th of 2014, he kept $700,000. He took the rest in cash and literally handed it over to John, who then, in July, deposited all $54,000 back. He used the $54,000 to buy a Tesla. So, the court found that that's when the dissipation occurred. It's the same sort of thing as using cash. When you have… And actually, Donna filed 31 claims of missing cash. She didn't know where the cash went. She didn't know what the dissipation was. The burden switches to Stephen to show that it's not dissipation. So, the dissipation here occurred when Stephen gave access to that money to John. And Stephen had to show that it wasn't used for a non-marital purpose. And with respect to the $33,000 that was left in the account, assuming that John didn't make any issues, that's what was left, and that's what he could show was not dissipated. The dissipation occurred as soon as those funds were given over to John. And that's what… Again, I don't understand. Why is that dissipation? Just because… He turned it over. He turned it 100%. John had total control. Is that what you're saying? Except for $700,000. He gave John $300 million. Correct. At that time, John could have used the money any way he wanted, but he didn't. He used 50… So, you're saying that there was a dissipation for the car, the $54,000. When did Donna know about that car? Donna became aware of all of this, the latest of which was on September 3rd, when she realized that all of those funds had been in John's control and he kept $64,000 of it. I think she was aware that something was fishy going on right from the time that she called Northern Trust in early February and said she was deaf and tall and found that there had been $4.5 million at times, $3.7 million in the account and that John's name, not hers, was intermittently on and off that account. So, she was aware and she said when she testified that by June 13th, when she got the interrogatory answers, when Stephen discussed that John had gotten that money, that she was very suspicious that Stephen was taking marital money and putting it in John's name. So, she was on inquiry notice, we think, even earlier than September 3rd, but certainly by September 3rd. So, what she needed to do was file a dissipation claim somewhere between September 3rd of 2014 and September 3rd of 2017. She didn't do it and that is why she missed Section 4 of that Act, which requires that under a statute of limitations. A dissipation occurred when the money went to John. Dissipation didn't occur when it was made with various transactions. Same thing with missing cash. The alleged dissipation occurred when the person spends the missing cash. And Donna wouldn't know and didn't know about the 31 claims that she made about missing cash, where that cash went. Nevertheless, she filed a dissipation claim. She filed 31 instances of missing cash and the court found that Stephen didn't meet his burden with respect to $39,000 of that money. So, you don't know and that's true with statute of limitations as well. You don't need to know exactly what the nature of your injury is in order for statute of limitations to start to run. What you do need to know is you need to be on inquiry notice that there's something rotten in Denmark and she was on inquiry notice. The latest of which was on July 3rd of, I'm sorry, September 3rd of 2014. So, the only thing that Donna did was she waited until the very last minute and filed her claim for dissipation right after 30 days from the close of the discovery, but she did not meet the statute of limitations. The other issues, does anybody else have any questions about that? Or do you see cash analysis? No? Okay. The other issues I want to just say is, again, that no Chicago Bank Corp. assets went into NBHI. NBHI was funded by the Chicago Bank Corp. on behalf of Stephen and John. There were shareholder distributions made on Stephen and John's behalf. And that was shown in undisputed records that were contemporaneously made and made three years before the breakdown of the marriage. Let's see if there's anything else on the inquiry notice that I want to share here. The court also made an alternative holding that Donna didn't discuss. During the motion for reconsideration, Donna, as she just stated, raised the issue of dissipation. And the judge did not change the dissipation analysis. But what the judge did observe was that she probably would have exercised her discretion, even if it hadn't been time-barred, and, quote, not tagged Stephen with the dissipation, unquote. And that's at the record at 4489. And the trial court stated that because she found that Stephen used those funds in his joint account to make investments with John. Although they were dissipation, she would soon think that he should be tagged with that. And it's stated in Unitarian as a foster. A court is not required to charge against the party the amount found to be dissipated. It may do so if an exercise of discretion. So the trial court or the judge, as it was indicated, how she would have exercised her discretion if the funds were not ‑‑ if the matter was not time-barred, which it was. Thank you very much. You have the last word. Just only on the issue of dissipation. Very good. Thank you so much. Let's go backwards from the last point, the alternative holding argument advanced by counsel. This was not an alternative holding by the trial court. It was an off‑the‑cuff statement made during the motion to reconsider. It contradicts the express finding of the trial court in the judgment of dissolution of marriage that the claim dissipation arose from Stephen. The dissipation claims and Donna's dissipation claims, most of those arose from Stephen making transfers to John, which was not a marital purpose. And all of the funds in her dissipation claim were marital funds. So these were clearly dissipation items, and that's why we would ask that the court reverse, remand, and direct the finding is that these are dissipation, because that's consistent with the actual findings of the trial court in the judgment. Regarding the Tesla, Stephen claimed in that September 3, 2014, letter that he had no documents to show what happened to the $64,035 that was part of the total of $3.7 million plus taken from the original Northern Trust account. He said he had no records to show what he did with that, because Donna was asking. Later he did. Later he did. 15 days later. Okay, so now you know. But that's September 18, 2014. So now you know there's dissipation September 18, 2014. Now you're still three years too late. No, we're not. She's not too late in providing notice of the intent to claim dissipation. Again, it's two separate issues. The notice is section one. So she timely filed her notice of intent to claim dissipation within 30 days of the close of discovery. When the court can find that dissipation actually occurred, if we're looking at a three-year window, okay, then, okay, fine. September 18, 2017, which would have been, you know, if the time period would have run out September 18, 2017, that's still after the time that she filed the notice. Regarding... Wait, wait, wait, wait. You filed the notice on what date? September 7, 2017. So you're saying that September 7, so if it's the 18th, then she's fine, right? Correct. And if it's the 14th, is that a lot? No. If it's the 14th... No, if it's September... Wait, is it the 20th? What was it? The date? She said that she should have known on what, September... September 3rd date, that was a different issue. That was the $3.7 million that went into the two Northern Trust accounts. And the reason why we're disputing that September 3rd date is because as of September 3rd, 2014, Stephen said in that same letter, where he said, I don't have any records to show what I did with $64,000 from the original Northern Trust account. He said in that same letter, he acknowledged that all of the $3.7 million that was taken from the original Northern Trust account had been, quote, redeposited to Northern Trust accounts 0590 and 3752, those two new accounts that he held with John. So as of September 3rd, 2014, the only thing Donna could have known was that there were funds in those two accounts. Whatever he had taken was put back into two accounts, was redeposited, and was still in the marital estate because Stephen still had access to those funds and control of those funds. So you're saying that that is dissipation, and Ms. Levine is saying that is not dissipation because the money wasn't being used for anything. It's from one account to another account. That's all it was. Correct. I'm saying... The money was still there in total. It was still there. If it had sat there in account 3752 throughout the case, it would have been allocated just like the rest of the funds. Why isn't that in use when his brother is on the account? His brother has nothing to do with that money. No, and in fact, the testimony shows there was no evidence or any testimony that John Cox deposited $1 to those new accounts or withdrew $1 from those new accounts. It was all Stephen. This was all his money. This was all his doing. Okay, so you're saying it doesn't matter. It doesn't matter that John's name is on it. The funds are still there. It's not dissipation until the funds leave those accounts and go somewhere where Stephen and Donna can no longer access it, meaning it goes into John's sole control. Well, then what is your position as to what John used it for? I mean, my understanding is he used it for his children. John? Respectfully, I don't think it's not relevant. Stephen used it for his children. So where is the dissipation? The judge said, even if the judge said it, you say she may have made the comment during reconsideration. Whether it's reconsideration or not, the question is, what was it used for? Where's the dissipation? What is the dissipation, you say? Give me the specifics. The dissipation is when Stephen transfers the funds to John and just gives him the money. For example, when he gave a $500,219 cashier's check from one of those accounts to John. You're saying when he gives it to John. Yeah, when he actually gives it to John. And here's the question. If John could have accessed those accounts, why didn't John just take the money out of the account? Because it's a red herring. John never intended to and was never going to transact in those accounts because the funds were Stephen's. The funds were marital funds. The funds stayed in the account until Stephen took action to transfer them out of the account and to his brother. So just to double check, you're saying he moved those funds on the 18th? September 8th? No, Justice. If you look at the dissipation claim, when we go through those two new Northern Trust accounts, there was a total withdrawal of about $771,000 from one of the accounts that occurred over the course of April 2016 to March 2017. There was a $500,000 cashier's check to John on April 13th, 2016. I'm not talking 2016, I'm talking 2014. 2014, when did the money go into the account? The monies went into the account in July of 2014. You knew about that on September 3rd. You should have known. On September 3rd, 2014, the only thing Donna Koch knew is that the funds that were taken from the original Northern Trust account had been redeposited to two new Northern Trust accounts with Stephen's name on it and Stephen's brother's name on it. But it doesn't matter that Stephen's brother's name was on it because the funds were still there and they were still available. They weren't gone. They weren't gone from the marital estate at that point. And that's the whole concept. Do you have any case that says that's not dissipation? Correct. Transferring funds. Do you have a case that says that's not dissipation? The case law that we cited cites what dissipation is defined as. Is there a case that says that when the husband puts money from one account into another account, that's dissipation? No. Dissipation is defined by Illinois law as one spouse's use of marital property for his or her own benefit for a purpose unrelated to the marriage at a time when the marriage is undergoing an irretrievable breakdown. And then whether a given person... And that didn't happen until 2016. Correct. He didn't use the funds. He didn't waste the funds until 2016 and 2017. If we look at In Reign to Marriage of Rye, RAI, which is a first district case from 1989, there they talk about you have to show how the funds were spent. How did you spend the funds? It's not how did you transfer funds from one account to another and leave them there. It's when they're spent. When they're spent, when they're moved out of the account, what are they spent on? Is it a marital purpose? Here, as the trial court found, giving the funds to John was not a marital purpose. That's when the dissipation happened, not when he just moved the funds from one account to another. Any other questions? Do you want to finish? Anything else? No, thank you, Justice. Okay, thank you. Thank you. I want to thank both parties. You gave us a lot to think about, a lot of briefs and attached documents to the appendix of the briefs, and we've gone through all that. We'll take this case under advisement. Excellent arguments by both of you. You've given us a lot to think about, and so we'll be recess at this time, and thank you very much.